Affirmed and Opinion filed May 29, 2003









Affirmed
and Opinion filed May 29, 2003.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-02-00715-CR

____________

 

JOHN
PATRICK PRENGER, Appellant

 

V.

 

THE
STATE OF TEXAS, Appellee

 



 

On Appeal from the
240th District Court

Fort
Bend
County, Texas

Trial Court Cause
No. 33,541B

 



 

O P I N I O N








A jury found appellant
John Patrick Prenger guilty of manslaughter in the death of his girlfriend=s four-year-old son, Cody
Barree.  The child died of asphyxiation
some time after appellant wrapped him in a blanket and secured it with belts at
his chest and feet, apparently in an effort to control the child=s behavior.  Appellant was sentenced to twenty years= confinement in the Texas
Department of Criminal Justice, Institutional Division, and fined $10,000.  In a single issue, appellant contends the
trial court erred in denying his requested jury instruction on justification
under section 9.61 of the Texas Penal Code as a defense to murder and
manslaughter charges.  Finding no
evidence that the type of binding appellant used could not cause death, we
affirm.




BACKGROUND

Appellant lived with his
girlfriend, Tanya Baird, and two of her children, four year old Cody and his
brother, Russell.  In the early morning
hours of Saturday, June 24, 2000, appellant called an ambulance to their
apartment when he discovered that Cody was unconscious.  Cody was taken to a hospital where he later
died.  

Prior to appellant=s arrest, he was
interviewed at the hospital by a police detective.  The interview was tape-recorded and played
for the jury at appellant=s
trial.  In the interview, appellant
explained that Cody had been increasingly misbehaving over the past several
days, and that he and Tanya had been unsuccessful in their attempts to
discipline him.  He stated that they had
“whipped him” for “four days straight,” but because Cody began bruising, they
tried other methods.  On Thursday night,
they tried wrapping Cody in a blanket and confining him with belts at the chest
and legs to prevent him from getting up at night and wandering around, and
“throwing a fit.”  This apparently
worked, so the next day, Friday, appellant again wrapped Cody in a blanket and
secured it with belts at the chest and feet. 









Cody was apparently
confined this way periodically during the day, although appellant stated that
he would check on Cody and let him out for two or three hours at a time to eat,
drink, and use the bathroom.  Appellant
also stated that Cody got up and tried to cover Russell with a pillow and was
“acting violent” before he put him in the blanket.[1]  When appellant later checked on Cody,[2]
he found Cody was not responsive, and so he removed the belts and the blanket
to try to revive him.  He also alerted
Tanya and called for the ambulance. 
During the interview, appellant repeatedly stated that he never would
have thought or suspected something like that could happen, especially since
the restraint had “worked fine” the night before, and he never intended to harm
Cody.

Dr. Lee Ann Krishnan, the
medical examiner who performed the autopsy on Cody, testified at trial that she
determined the cause of death to be “consistent with asphyxia, secondary to
constriction of the chest.”  Dr. Krishnan
further testified that Cody died a very slow death.  She also opined that, based on the way the
death was described in the police reports, it may have taken hours for Cody to
die in circumstances in which his breathing became more and more shallow as he
began to tire from having to breathe against the pressure on his chest, until
he could no longer get enough oxygen to keep his brain and heart functioning,
and he finally became comatose and died. 


The jury also heard the
testimony of Dr. Carmen Petzold, a psychologist in private practice, who was
retained by appellant.  She testified
that children who exhibit “extreme” and dangerous behavior may be hospitalized,
and may have to be restrained because of the danger to themselves and
others.  Dr. Petzold described various
types of restraints that may be used in healthcare facilities, and testified
that the use of a restraint on Cody would meet the Joint Commission on
Accreditation of Healthcare Organizations (JCAH) guidelines for the use of
restraints because he tried to smother his brother with a pillow.  








However, on
cross-examination, Dr. Petzold admitted that there was no restraint she knew of
in which someone is rolled up in a blanket and tied at their chest and
legs.  She clarified her earlier
statement by explaining that restraint may be justified when someone is in
danger of hurting themselves or others. 
She admitted that the way Cody was restrained was not proper, and it was not
something she would have done.  Then, the
following exchange occurred as the State continued its cross-examination:  

Q.        (By Mr. McAlister) Based on your 25
years of experience prior to Cody=s death, would you
have thought it would be dangerous to wrap a child up in a blanket, constrict
his chest with a belt and tie his feet up with a belt?

A.        Yes.

Q.        So, for the average person on the street
and for JCAH, that would not be a recommended method of restraint?

A.        Of course not.  JCAH has all these other terrific mechanical
restraints that you can use.

Q.        Do you think that the average person
would believe that that is an accepted method of restraint of a child?

A.        Yes, I do think B I think that an
average uneducated person trying to control a dangerous, out-of-control child
could think that this could work, yes.

Later, on redirect, Dr. Petzold
elaborated on the basis for her opinion, testifying that the average person in
the same situation would be influenced to believe the use of such a restraint
was not dangerous by factors such as the knowledge that hospitals and other
institutions use similar restraints, the accepted use of restraints by law
enforcement officials, and, as in the present situation, the fact that the
restraint had been used successfully before 
to restrain the child=s
behavior without harm.  She also stated
that it was important to consider that many other types of discipline had been
tried and failed when evaluating the reasonableness of restraining the child.








At the charge conference,
prior to closing arguments, appellant objected to the prepared charge and
requested an instruction on the defense of justification under section 9.61 of
the Penal Code for all the charged offenses. 
Under section 9.61 of the Penal Code, a person acting “in loco parentis”
to a child is justified in using force, but not deadly force, “when and to the
degree the person reasonably believes the force is necessary to discipline the
child or to safeguard or promote his welfare.” 
See Tex. Pen. Code Ann.
' 9.61.  As prepared, the charge limited the justification
instruction to the offense of injury to a child.  Appellant requested that the defense be
included with all the other charged offenses, including murder, manslaughter,
criminally negligent homicide, and endangering a child.  After hearing argument, the trial court
determined that the instruction was not applicable because deadly force was
used, and overruled the objection.  The
jury subsequently acquitted appellant of murder, but found him guilty of
manslaughter.  

DISCUSSION

On appeal, appellant contends
the trial court erred in denying his requested jury instruction on
justification under section 9.61 of the Penal Code for the defense of murder
and manslaughter, and that the error was harmful.  Appellant argues the trial court was required
to instruct the jury on justification because he presented more than a
scintilla of evidence raising the issue, and its error precluded the jurors
from acquitting him of manslaughter.

1.         Preservation of Error

As an initial matter, the
State suggests that appellant failed to preserve error because no written
request appears in the record, and the instruction read into the record applied
only to the offense of injury to a child. 
However, as the State acknowledges, appellant requested that the
instruction be applied to all charged offenses, and our review of the record
confirms that the trial court clearly understood appellant=s objection and
request.  Moreover, the requirement that
the instruction be in writing is complied with if the instructions are dictated
to the court reporter in the presence of the trial court and the State=s counsel, before the
reading of the court=s
charge to the jury.  Tex. Code Crim. Proc. Ann. art. 36.15
(Vernon Supp. 2003).  Here, appellant
presented his objection to the trial court before the charge was read to the
jury, dictated the form of the proposed instruction he requested be included
with each charged offense, and the trial court, after hearing argument, refused
his request.  We find that appellant
sufficiently preserved error.  See
Tex. Code Crim. Proc. Ann. art.
36.14, 36.15. 








2.         Standard of Review

A defendant in a criminal
prosecution has the right to a jury instruction on any defensive issue that is
raised by the evidence, whether that evidence is weak or strong, unimpeached or
contradicted, and regardless of what the trial court may or may not think about
the credibility of the evidence.  See
Granger v. State, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999) (op. on reh=g).  This rule is designed to insure that the jury,
not the judge, will decide the relative credibility of the evidence.  Id. 
When a judge refuses to give an instruction on a defensive issue because
the evidence supporting it is weak or unbelievable, he effectively substitutes
his judgment on the weight of the evidence for that of the jury.  Woodfox v. State, 742 S.W.2d 408, 410 (Tex. Crim. App.
1987).  However, if the evidence, viewed
in the light most favorable to the defendant, does not establish the defensive
issue, the defendant is not entitled to an instruction on the issue.  See Granger, 3 S.W.3d at 38.  

If the reviewing court
determines that the trial court erred in refusing to include the requested
instruction in the charge, it must then determine whether the error was harmful
to the defendant.  See Payne v. State,
11 S.W.3d 231, 232 (Tex.
Crim. App. 2000); Almanza v. State, 686 S.W.2d 151, 171 (Tex. Crim. App.
1984) (op. on reh=g).  If the error in the charge was the subject of
a timely objection in the trial court, then reversal is required if the error
is “calculated to injure the rights of defendant,” which means that there must
be some harm to the accused from the error. 
See Tex. Code Crim. Proc.
Ann. art. 36.19 (Vernon 1981); Almanza, 686 S.W.2d at 171.  We must examine the relevant portions of the
entire record to determine whether appellant suffered any actual harm as a
result of the error.  See Arline v.
State, 721 S.W.2d 348 (Tex. Crim. App. 1986).  

3.         Did the Trial Court Err in Refusing to
Apply the Justification Defense to the Offenses of Murder and Manslaughter?

Appellant contends he
raised the issue of justification under section 9.61 of the Texas Penal Code, and
therefore the trial court erred in refusing to apply it to the charged offenses
of murder and manslaughter.  Section 9.61
provides as follows:

(a) The use of
force, but not deadly force, against a child younger than 18 years is
justified:

(1) if the actor
is the child’s parent or stepparent or is acting in loco parentis to the child;
and

(2) when and to
the degree the actor reasonably believes the force is necessary to discipline
the child or to safeguard or promote his welfare.

(b) For purposes
of this section, “in loco parentis” includes grandparent and guardian, any
person acting by, through, or under the direction of a court with jurisdiction
over the child, and anyone who has express or implied consent of the parent or
parents.

Tex. Pen.
Code Ann. '
9.61.  Appellant argues that all the
evidence shows he was attempting to discipline and restrain Cody.  Specifically, appellant points to (1) the
testimony of Dr. Petzold that a reasonable person might have believed the
restraint was necessary to safeguard the child, and (2) appellant=s lack of intent or
knowledge that his actions were capable of causing death or serious bodily
injury. Appellant further argues that neither the language of section 9.61 nor
case law interpreting the statute limits the application of the defense to
murder and manslaughter.  

Our review of the case
law leads us to conclude that appellant incorrectly relies on his subjective
knowledge or on a reasonable person=s
belief that restraint might be necessary; these facts do not support submission
of the issue.  Instead, we must look for
any evidence that deadly force was not used. 
See Tex. Pen. Code Ann.
' 9.61(a)(2) (providing
that the use of force, but not deadly force, is justified when and to the
degree the actor reasonably believes the force is necessary to discipline the
child or to safeguard or promote his welfare). 








We reach this conclusion
based on Ferrel v. State, 55 S.W.3d 586 (Tex. Crim. App. 2001).  There, the Court of Criminal Appeals
considered the analogous question whether a defendant was entitled to a
self-defense instruction under section 9.31 of the Penal Code; that section
provides that a person is justified in using non-deadly force against another
when and to the degree he reasonably believes the force is immediately
necessary to protect himself against the other=s
use or attempted use of unlawful force.  Ferrel,
55 S.W.3d at 591B92.  In that case, during an altercation in a pool
hall, Ferrel hit another man in the mouth with a beer bottle.  The man fell straight back, hit his head on
the floor, and died.  A jury convicted
Ferrel of aggravated assault.  Id.
at 587.  

In determining whether
Ferrel was entitled to the section 9.31 self-defense instruction, the Court of
Criminal Appeals first emphasized that section 9.31 applies to the justifiable
use of non-deadly force, unlike section 9.32, which applies to the justifiable
use of deadly force.  Id. at
591.  Having noted this important
distinction, the Court reviewed the record to determine “whether there was
evidence that Ferrel did not use deadly force.” 
Id.  The Court began with
the Texas Penal Code definition of “deadly force” as “force that is intended or
known by the actor to cause, or in the manner of its use or intended use is
capable of causing, death or serious bodily injury.”  Id. at 591B92.  As the Court explained:

For there to be
evidence that Ferrel did not use deadly force, there must have been evidence
that the beer bottle was not capable of causing death or serious bodily injury
in the manner of its use or intended use. 
The Court of Appeals held that Ferrel was entitled to a ' 9.31(a) self‑defense
instruction based on the faulty assumption that there was evidence that the
beer bottle did not cause serious bodily injury and that, in the manner the
bottle was used, it was incapable of causing serious bodily injury.  Because we have found that the actual blow of
the bottle indisputably caused serious bodily injury to McManus, Ferrel by
definition used deadly force.  Hence, a ' 9.31(a) self‑defense
instruction is not applicable and the trial court did not err in refusing to
give one.

Id. at 592
(footnotes omitted).  








We find the Ferrel court=s reasoning
instructive.  Section 9.61, like section
9.31, provides only for the use of non-deadly force.  As defined, “deadly force” is either (1)
force that is intended or known by the actor to cause death or serious bodily
injury, or (2) force that is capable of causing death or serious bodily injury
in the manner of its use or intended use. 
See Ferrel, 55 S.W.3d at 591B92.  The State does not argue that appellant
intentionally or knowingly sought to cause death or serious bodily injury by
restraining Cody as he did.  Therefore,
the only issue is whether there was any evidence that the restraint of a
blanket secured by belts at the chest and feet was not capable of causing death
or serious bodily injury in the manner of its use or intended use.  

We have reviewed the
record and find no evidence to support this conclusion.  While Dr. Petzold testified that the use of
restraints may be appropriate in some circumstances to protect a child or
others from harm, she also testified that the method appellant used was not
recommended and was inappropriate.  In
fact, Dr. Petzold agreed that wrapping a child up in a blanket, constricting
his chest with a belt, and tying his feet up with a belt would be
dangerous.  Moreover, when asked
hypothetically how tight such a restraint should be on a child, she testified
that it should be “not so tight as to constrict their breathing.”  She did not testify that the blanket and belt
restraint was not capable of causing death or serious bodily injury.  She also acknowledged thatCeven when used by
hospitals and other agenciesCrestraints
are dangerous and deaths occur each year.

Appellant=s testimony that he never
intended to harm Cody, and his prior use of the restraint without harm, is not
evidence that the restraint was not capable of causing death or serious bodily
injury.  Moreover, it is undisputed that
Cody actually died from appellant=s
use of the blanket and belt restraint. 
Appellant does not challenge the legal or factual sufficiency of his
conviction for manslaughter.  Therefore,
by definition, appellant used deadly force. 





See id. at
592.  The trial court did not err in
refusing the instruction.[3]  








The judgment of the trial
court is affirmed.

 

/s/        Wanda McKee Fowler

Justice

 

 

 

Judgment rendered and Opinion filed May 29, 2003.

Panel consists of Chief Justice Brister and Justices Fowler and
Frost.

Publish C Tex. R. App. P. 47.2(b).

 











[1]  Other
witnesses testified to Cody=s difficult behavior. 
Gayle Farley, Tanya Baird’s mother and Cody=s grandmother, testified regarding two conversations
she had with Tanya about the problems she was having with Cody.  The first conversation took place one week
before Cody=s death.  The
second conversation was a phone call at 8:30 p.m. on the day before Cody died,
and Tanya told Farley about Cody getting up at night and putting a pillow over Russell=s face.  Later,
after Cody’s death, Farley testified that she said to a detective on the case
“I’m wondering if that just happened because [appellant] was at the end of his
rope?”  Another witness, Shari Stevens,
who had been a babysitter for Tanya, described Cody as a very unhappy baby who
cried all the time, and an “aggressive bad boy” whose behavior became worse
over time.





[2]  We cannot tell
from the record how long appellant would leave Cody bound in the blanket.





[3]  In support of his
issue, appellant cites two cases, Teubner v. State, 742 S.W.2d 57 (Tex. App.CHouston
[14th Dist.]
pet. ref’d), and McClinton v. State, 647 S.W.2d 400 (Tex. App.CFort
Worth
1983, pet. ref’d).  Appellant argues
these cases demonstrate that the availability of the defense is determined by
the type and reasonableness of force used, not whether death results.  Teubner is inapplicable because it did not address the issue whether
an instruction under section 9.61 was warranted.  In McClinton, the Fort
Worth  court of appeals did note the severity of the beatings given the child,
but, ultimately, it pointed out that the behavior killed the child and
therefore it did not qualify as non-deadly force.  647 S.W.2d at 407.  Thus, neither case assists appellant and,
more importantly, the Court of Criminal Appeals has spoken via Ferrel
and instructed the courts to look to the result the behavior could cause.